## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## DELTA DIVISION

**LEROY DONALD NESBIT**                                    **PLAINTIFF**

**VERSUS**                              **CIVIL ACTION NO.: 2:09CV156-P-S**

**WEST BOLIVAR SCHOOL DISTRICT**                          **DEFENDANT**

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED PER F.R.C.P. 12(B)(6) OR, ALTERNATIVELY, FOR JUDGMENT ON THE PLEADINGS PER F.R.C.P. 12(c)

Comes now Plaintiff, by and through counsel, and submits this his Brief in Opposition to Defendant's Motion to Dismiss for Failure to State a Claim upon which Relief Can Be Granted, or in the Alternative, for Judgment on the Pleadings, and would show the Court the following:

## I.  INTRODUCTION

The primary basis for Defendant's Motion is Plaintiff's purported failure to plead factual details as to all claims and to allege a policy on the part of the Defendant School District, as to Plaintiff's 42 U.S.C.A. claim against the School District.

In conjunction with Plaintiff's response to Defendant's Motion, Plaintiff is also submitting his Motion to Amend his Complaint.  While not conceding Defendant's assertion that his factual allegations are insufficient, Plaintiff's proposed Second Amended Complaint identifies policies or customs of the School District which are a "moving force" behind the constitutional violations, and pleads more facts in support of all claims.

Additionally, Plaintiff's Second Amended Complaint adds two Defendants in their individual capacities, Henry Phillips, Jr., the District Superintendent, and Manika Kemp, who was the Principal of Rosedale High School during Plaintiff's second, and final, school year of employment.

## II. FACTUAL ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

The Second Amended Complaint alleges the following:

The Plaintiff, Leroy Donald Nesbit, is a white person who moved to Mississippi to assist in providing education for minority citizens in the poverty-stricken Mississippi Delta.

Plaintiff successfully completed his teaching duties for the 2007-2008 school year, teaching high school English. However, for the 2008-2009 school year, a new principal, Manika Kemp, was hired at Plaintiff's school. Mrs. Kemp is a black female who expressed racial animosity toward Plaintiff and other white teachers. Plaintiff was harassed by Kemp because of his race. Kemp requested that Plaintiff perform unnecessary administrative work and repeatedly asked Plaintiff to resign. Plaintiff and other white teachers at the school were treated differently by Kemp because of their race. Specifically, white teachers were subjected to different and more rigorous evaluation standards than black teachers. They were subjected to repeated and constant rudeness, which interfered with their abilities to teach. For example, Plaintiff's classroom was constantly interrupted and disturbed by Kemp and others. Plaintiff was subjected to intense and constant scrutiny in the classroom. That scrutiny was intended to interfere with Plaintiff's teaching. Plaintiff was required to redraft lesson plans and curriculum that had already been approved and was forced to resubmit other paperwork because it was

2

allegedly incorrect or insufficient, even though other teachers who had drafted the paperwork in the same way as Plaintiff were not required to change it or to resubmit it.

When Kemp learned that Nesbit was in financial trouble and that his wife was unable to find a job in the area, within a week, she placed Nesbit on a performance improvement plan and threatened him with termination. Kemp's harassment of Nesbit and other white teachers was intended to make them quit, because of their race. Superintendent Phillips refused to correct or even address this discriminatory treatment, despite the complaints of Plaintiff and other white teachers. When Plaintiff complained, Phillips suggested to Plaintiff that he should quit. This harassment by Kemp and Phillips and Phillips' refusal to address and correct the discriminatory treatment constituted a hostile work environment. The assistant principal even apologized to Plaintiff for the treatment he was receiving from Kemp.

Although Plaintiff had never taught high school, during his first year with the District in the 2007-08 school year, he was quickly becoming an excellent teacher by any reasonable standard. He was advised that his teaching skills were good by Superintendent Phillips, outside evaluators hired by the district, evaluators sent by the Mississippi Department of Education, the Principal of the high school for the 2007-08 school year, and the Assistant Principal. Even after Kemp became Principal for the 2008-09 school year, Plaintiff was praised by all evaluators, except for Kemp.

Plaintiff had not been treated in a discriminatory fashion before Kemp became Principal of Rosedale High School. The District's policy, however, as implemented by the Superintendent, was to accept the judgment of the school Principal, particularly as to the

evaluation and discipline of teachers, and as to the recommendations for hiring, termination and/or non-renewal. When Plaintiff complained to Superintendent Phillips, who is black, about the harassment and unfair treatment by Kemp, Phillips' only response was to say that he supported Kemp 100 percent. Phillips also suggested that Nesbit resign and accept a part-time position with another employer. It was made clear to Nesbit that he had no recourse from his treatment by Kemp. Phillips and Kemp are, in effect, policymakers for the School District with respect to treatment of the teachers working under them.

Because of this harassment and racially disparate treatment, Plaintiff agreed to resign from his employment, conditioned upon his getting another job outside of the District.

Nesbit informed his students, who are almost all black, that he was resigning. Nesbit and his students were very close. The students regarded him as an outstanding English teacher and they believed he was their best teacher. In fact, they considered his being removed from the classroom to be detrimental to both their education and to their chances for success in life.

Furthermore, most of Nesbit's students had little contact with white persons, and the removal of Nesbit harmed their education by denying them contact with a white male, who was a positive influence on their lives.

Based upon their relationship with Nesbit, and their having witnessed Kemp's treatment of him, the students determined that Nesbit's resignation was not voluntary. Upon learning of Nesbit's resigning, his students protested and urged the District to retain Nesbit. Phillips has admitted that the students were within their rights to protest.

Touched by the students' protest, Nesbit informed the school authorities that he would

not resign his employment. He believed that doing so would harm the educational opportunities of his students. Teaching these underprivileged black students was challenging, rewarding, and provided an excellent opportunity for him to progress as a teacher. Nesbit also learned that he would be unable to find another teaching position as long as Defendants claimed that he was a poor teacher. Nesbit, already in poor financial condition, would be unable to pay his bills if he resigned.

After Nesbit informed the Defendant school Superintendent that he would not resign his employment, the Superintendent responded that Nesbit was terminated from his employment for a variety of frivolous reasons, including the claim that he had "incited a student protest," had committed insubordination, and had abandoned his position as teacher. The Superintendent gave Plaintiff a letter of termination dated February 20, 2009. This letter noted that Nesbit was entitled to a hearing, and Nesbit requested a hearing.

The Defendant District, whose Board of Trustees is entirely composed of black members, initially indicated it would grant the hearing. However, recognizing that there was no basis for requiring Nesbit to resign, and learning that witnesses it intended upon subpoenaing would all testify that Nesbit was, in fact, a good teacher, and determining that they did not want to subject the District to a public hearing where Kemp and Phillips' treatment of Nesbit would be made public, the School District then stated, by letter dated March 16, 2009, that the hearing would be "rescheduled."

By letter dated March 17, 2009, the District informed Nesbit that, rather than reschedule the hearing, the District, through its Superintendent and Board Attorney, cancelled the

termination, and transferred Nesbit to the alternative school.

Nesbit's transfer constituted a demotion, since it changed his conditions of employment and reduced his responsibilities and duties to his detriment. Nesbit was transferred from teaching six full classes, including five literature classes and an advanced placement class, and having opportunities to enhance his teaching skills and interacting with numerous other, more experienced teachers, to tutoring five (5) sixth and seventh graders, who already had a teacher, in remedial reading and writing at the Alternative School.

Nesbit's contract states that he can be transferred. However, this transfer (1) was the result of racism; (2) had the effect of depriving Plaintiff's almost entirely black classes of the opportunity to associate with a positive white male role model; (3) infringed upon the Plaintiff's and the students' rights to associate with persons of the opposite race; (4) was done for the purposes of preventing Nesbit from having a hearing, to which he was entitled; and (5) violated the School District's obligation under Mississippi law to carry out its contract with Nesbit in good faith.

On March 20, 2009, Nesbit filed an EEOC charge alleging discrimination. By letter dated April 15, 2009, Defendants refused to renew Nesbit's contract.

Nesbit had actually found another job, and had reached the stage of filling out pre-employment paperwork, when the prospective employer school district contacted Phillips and Kemp. The prospective employer immediately halted the hiring process.

After Nesbit's non-renewal, the Board of Education instructed the Superintendent of Education to send Nesbit a certified letter asking him to come before the Board to tell his side

of the story.  The Superintendent refused to do so.  All of the other white teachers also failed to return to school after the 2008-09 school year.  All were replaced by black teachers.

### III.  STANDARD OF REVIEW

In deciding a motion to dismiss under Fed.R.Civ.P. 12(B)(6), this Court is guided by four recent United States Supreme Court cases.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) held that a complaint under the Sherman Anti-Trust Act for conspiring to restrain trade was not sufficient without pleading facts to show such an anti-competitive agreement existed.  The Court stated:

> In applying these general standards to a Section One claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made.  Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleadings stage; it is simply cause for enough facts to raise a sufficient expectation that discovery will prevail evidence of an illegal agreement.  And, of course, a well-pleaded complaint may proceed, even if it strikes a savvy judge that actual proof of these facts is improbable, and 'that a recovery is very remote and unlikely.'

550 U.S. at 556.

A complaint alleging an Eighth Amendment violation for indifference to serious medical needs was held sufficient by the United States Supreme Court in *Erickson v. Pardus*, 551 U.S. 89 (2007).  Petitioner's complaint in *Erickson* alleged that prison officials had diagnosed him as requiring treatment for Hepatitis C.  The complaint alleged that "Dr. Bloor had removed him from [his] Hepatitis C treatment, in violation of Department protocol, thus endangering his life, " and made various factual statements of the reason defendant had given for stopping the treatment."  551 U.S. at 91.

The District Court and the United States Court of Appeals had dismissed the complaint

on the grounds that the complaint failed to allege that the discontinuation of the treatment had

caused plaintiff any actual harm. The United States Supreme Court reversed, finding that the

lower courts had taken an overly technical view of the rules of pleading::

> Federal Rule of Civil Procedure 8(a)(2) requires 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of the . . . claim . . . and the grounds upon which is rests.' *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554-555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957). In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. *Bell Atlantic Corp, supra* at 555-556. The complaint stated that Dr. Bloor's decision to remove petitioner from his prescribed Hepatitis C medication was 'endangering his life.' Petitioner's Complaint 2. It alleged that his medication was withheld 'shortly after petitioner had commenced a treatment program that would take one year that he was still in need of treatment for his disease,' and that the prison officials were in the meantime refusing to provide treatment. *Id.* at 3-4. This, alone, was sufficient to satisfy Rule 8(a)(2).

*Erickson*, 551 U.S. at 93-94.

In *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937 (2009), plaintiff, a Pakistani Muslim, alleged

he was detained by federal officials because of his race, religion, and national origin, and that the

FBI had originally retained thousands of Muslim men as part of its September 11th investigation.

Defendant's executive officials were claimed to be liable on the ground they condoned or agreed

to the detainments and confinements.

The United States Supreme Court held these allegations insufficient to state a claim,

reasoning as follows:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' As the Court held in *Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation. *Id.*, at 555, 127 S.Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265-286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555, 127 S.Ct. 1955. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' *Id.* at 557, 127 S.Ct. 1955.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' *Id.*, at 570, 127 S.Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S.Ct. 1955. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.' *Id.*, at 557, 127 S.Ct. 1955 (brackets omitted).

Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.*, at 555, 127 S.Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.' (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556, 127 S.Ct. 1955. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.' Fed. Rule Civ. Proc. 8(a)(2).

*Iqbal*, at 129 S.Ct. at 1949.

The fact that *Iqbal* involved Arab Muslim detainees following the savage September 11th attack by Arab Muslims was critical to its outcome. The court reasoned that since

the September 11th attacks were perpetrated by 19 Arab Muslim highjackers affiliated with Al Queda '[i]t should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims.

129 S.Ct. at 1952.

Furthermore, all the complaint:

plausibly suggests is that the nation's top law enforcement officers in the aftermath of a devastating terrorist attack, sought to keep suspected terrorist in the most secure conditions available until the suspects could be cleared of terrorist activity.

129 S.Ct. at 1952.

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) is similar to this case, since it is an employment discrimination case. The Second Circuit had offered dismissal of the complaint on the grounds that a "prima facie case" of age discrimination which was not pled.  The complaint had alleged that plaintiff, age 53, was demoted in favor of a 32-year-old, because the defendant had wanted to "energize" the underwriting department, and that his replacement was far less experienced and qualified for the job than he.

According to the United States Supreme Court, the Second Circuit confused the proof necessary to prove race discrimination with what is necessary to plead race discrimination:

This court has never held that the requirements for establishing a prima facie case under *McDonnell-Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss.  For instance, we have rejected the argument that a Title VII complaint requires greater 'particularity' because this would 'too narrowly constric[t] the role of the pleadings.' . . . Consequently, the ordinary rules for assessing the sufficiency of a complaint apply.  *See, e.g., Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (when a federal court reviews the sufficiency of a complaint before reception of any evidence either by affidavit or admissions,

its task is necessarily a limited one. The issue is not whether plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims. In addition, under a notice pleading system, it is not appropriate to require plaintiff to plead facts establishing a prima facie case because the *McDonnell -Douglas* framework would not apply in every employment discrimination case. . . Moreover, the precise requirements of a prima facie case can vary depending on the context and 'were never intended to be rigid, mechanized or ritualistic.' *Furnco Construction Corp. v. Waters*, 438 U.S. 567. . .

534 U.S. at 511-12.

Nesbit's Complaint meets the standard of all the above cases and contains enough facts to demonstrate a "plausible claim" that he has been the victim of race discrimination, of violations of his rights under the First Amendment rights to freedom of association and speech, of his statutory and Constitutional rights to be free from retaliation, and of his Fourteenth Amendment rights to a hearing.

## IV. ARGUMENTS

### Argument I

**PLAINTIFF HAS ADEQUATELY PLED HIS CLAIMS OF RACE DISCRIMINATION, RETALIATION AND HOSTILE WORK ENVIRONMENT AGAINST THE SCHOOL DISTRICT AND INDIVIDUAL DEFENDANTS HENRY PHILLIPS, JR. AND MANIKA KEMP**

Nesbit alleges racial discrimination in his termination, transfer, and then non-renewal for a hostile work environment, and alleges that his non-renewal was also in retaliation for his filing of an EEOC charge. These claims are brought against the District under Title VII, as well as under 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment,[1]

---

[1] The Defendant only addresses Nesbit's equal protection claim under the "class of one" analysis. Nesbit does not make a "class of one" type claim. *See, Engquist v. Organ Department of Agriculture,* 128 S.Ct. 2146, 2154 (2008). Nesbit's equal protection claim is, rather, founded upon

pursuant to 42 U.S.C. § 1983. Additionally, these claims are also brought against the individual

Defendants, Superintendent Phillips and Principal Kemp, under § 1981 and the Equal Protection

Clause.[2]

The only substantive difference between a race discrimination analysis under Title VII,

and the Fourteenth Amendment is the issue of *respondeat superior* as *respondeat superior* does not

apply under 42 U.S.C. § 1983 that proof of a "policy" is necessary under 42 U.S.C. § 1983.

> The Equal Protection Clause directs that persons similarly situated should be treated alike. *Phyler v. Doe*, 457 U.S. 202, 216. . . (1982). 'To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class.' *Johnson*, 876 F.2d at 479 (citing *Washington v. Davis*, 426 U.S. 229, 247-48 . . . (1976)).

*Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999).

Claims of discrimination brought under § 1981 or the Fourteenth Amendment are

analyzed exactly the same way as claims brought under Title VII.

In this circuit '[e]mployment discrimination claims brought under 42 U.S.C. § 1981

---

race discrimination, which is clearly a constitutional violation. *Police Ass'n of New Orleans through Cannatella v. City of New Orleans*, 100 F.3d 1159, 1167 (5th Cir. 1996); *U.S. v. Lulac*, 793 F.2d 636, 646 (5th Cir. 1986).

    [2]    An individual supervisor may be personally liable under 42 U.S.C. § 1981 and § 1983. *See, e.g., Walker v. Uncle Ben's, Inc.*, 1998 WL 173228 *2 (N.D. Miss. 1998); *Foley v. University of Houston System*, 355 F.3d 333, 338 (5th Cir. 2003); *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004); *Al-Kharaji v. St. Francis College*, 784 F.2d 505, 518 (3d Cir. 1986); *Allen v. Denver Public School Bd*, 928 F.2d 978, 983 (10th Cir. 1991).
    Additionally, hostile work environment and retaliation claims may be brought under both § 1981 and the Equal Protection Clause. *Lauderdale v. Texas Dep't of Criminal* Justice, 512 F.3d 157, 166 (5th Cir. 2007); *Fisher v. University of Texas Medical Branch*, 2010 WL 173401 *6-7 (S.D. Tex. 2010); Steverson *v. Goldstein*, 24 F.3d 666, 670 (5th Cir. 1994); *Foley v. University of Houston System*, 355 F.3d 333, 339 (5th Cir. 2003); *Hawkins v. 1115 Legal Service Care*, 163 F.3d 684, 693 (2d Cir. 1998); *Humphreys v. CBOCS West, Inc.*, 474 F.3d 387, 397 (7th Cir. 2007); *Andrews v. Lakeshore Rehabilitation Hospital*, 140 F.3d 1405, 1411 n. 12 (11th Cir. 1998).

or § 1983 are analyzed under the evidentiary framework applicable to claims arising under Title VII of the Civil Rights Act of 1964, as amended by 42 U.S.C. § 2000(e)et seq.' *Lawrence v. University of Texas Medical Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999). In employment discrimination cases, a plaintiff must show intentional discrimination, a burden which can be met by presenting either direct or indirect evidence of discrimination.

*Bell v. South Delta School District*, 325 F.Supp.2d 728, 736 (S.D. Miss. 2004).

Plaintiff alleges that he was both replaced by someone who was black, and he, along with the other white teachers was treated less favorably than black employees. Nesbit's Second Amended Complaint, thus, adequately pleads a cause of action for race discrimination in the adverse employment actions against him.

Nesbit has also pled a claim for retaliation in violation of Title VII, § 1981 and § 1983. Nesbit must eventually demonstrate that he engaged in protected activity, the employer took an adverse employment action against him, and that there was a causal connection between the protected activity and the adverse employment action. *See, e.g., Mattern v. Eastman Kodak Co.*, 104 F.3d 702 (5th Cir. 1997). Plaintiff's Second Amended Complaint alleges that he filed an EEOC charge alleging discrimination on March 20, 2009. Twenty-six days later, on April 15, 2009, Nesbit received his letter of non-renewal. This timing, alone, gives rise to an inference of a race retaliation claim[3].

Nesbit has also adequately pled a claim for hostile work environment under Title VII, §

---

[3]    "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facia case of retaliation." *Swanson v. General Service Administration*, 110 F.3d 1180, 1188 (5th Cir. 1997). *Accord, Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993); *Washburn v. Harvey*, 504 F.3d 505, 511 (5th Cir. 2007); *Clark County School District v. Breeden*, 532 U.S. 268, 273-74 (2001) (A three or four month period may be close enough to make a *prima facia* case of causation); *Akon v. Quitman County School Dist.*, 2010 WL 780528 *6 (N.D. Miss. 2010).

1981 and § 1983. To make out a hostile work environment claim, Nesbit will eventually be required to prove that he 1) belonged to a protected group; 2) was subjected to unwelcome harassment; 3) the harassment complained of was based on race; and 4) the harassment affected a term, condition or privilege of employment. *Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295-298 n. 2 (5th Cir. 2001). However, the Complaint does not require these elements to be pled. *See, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

In this case, Nesbit has pled that he is white, that he was subject to unwelcome harassment, that all of the white teachers were subjected to this treatment, and that none of the black teachers were. Nesbit has pled that the harassment took the forms of repeatedly interrupting his classes, making it difficult for him to teach, being placed on performance improvement plans with impossible deadlines coupled with threats of termination, and requests for his resignation. Nesbit has pled sufficient facts from which to infer that "a term, condition or privilege" of his employment was affected because of his race, and Defendant's argument to the contrary is frivolous.

Nesbit has adequately pled claims of race discrimination, retaliation and hostile work environment in violation of Title VII § 1981 and § 1983, against the School District and both of the individual Defendants.

## **Argument II**

### **PLAINTIFF HAS ADEQUATELY PLED CAUSES OF ACTION AGAINST THE DEFENDANTS FOR VIOLATION OF HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHTS**

There is a property interest in an employment contract during the term of that contract.

"It is true that a property interest existed during the span of [plaintiff's] contract and, therefore, any dismissal or termination of her contract would have triggered all the precautions inherent within the due process clause." *Pruett v. Dumas*, 914 F.Supp. 133, 137-38 (N.D. Miss. 1996) (citing *McDonald v. Mims*, 577 F.2d 951, 952 (5th Cir. 1978); *Harris v. Canton Public School Board of Education*, 655 So.2d 898, 902 (Miss. 1995)). In the case at bar, Plaintiff Nesbit was removed from his teaching duties and sent to tutor a very small number of sixth and seventh grade remedial students who already had a teacher assigned to them. He no longer supervised classrooms, no longer taught full classes, and no longer was able to interact with other more-experienced teachers. The removal of Plaintiff Nesbit's duties during the period of his employment contract constituted a deprivation of his "property" interest in being a teacher during the term of his contract.

Similarly, Plaintiff was deprived of his liberty interest by Defendants. A deprivation of a liberty interest exists when a defendant has caused a plaintiff to lose his or her employment "in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities." *White v. Thomas*, 660 F.2d 680, 684 (5th Cir. 1981); *Rosenstein v. City of Dallas, Texas*, 876 F.2d 392, 395-96 n. 2 (5th cir. 1989). In this case, Nesbit was denied an opportunity to clear his name. Phillips and Kemp related their false and stigmatizing claims against Nesbit to, at least, one prospective employer, preventing him from receiving a job.

Further, the Defendants' acts were arbitrary and capricious in violation of state and federal law. Governmental action is arbitrary and capricious under Mississippi law when "it is not done

15

according to reason or judgment, but depending on the will alone." *Burks v. Amite County School Dist.*, 708 So.2d 1366, 1370 (Miss. 1998) (citing *McGowan v. Mississippi State Oil & Gas Board*, 604 So.2d 312, 322 (Miss. 1992). These cases further defined "capricious as any act done without reason, in a whimsical manner, implying either a life of understanding of or disregard for surrounding facts and settled controlling principles." *Burks*, 708 So.2d at 1370; *McGowan*, 604 So.2d at 322.

The Fourteenth Amendment prohibits any governmental action which is arbitrary and capricious. *Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir. 1988) (substantive due process safeguards prevent "arbitrary and capricious" Government action which deprives a person of a property or liberty interest). Further, Plaintiff does not need to demonstrate a property or liberty interest where the Government's actions were "offensive, arbitrary, capricious or wholly unrelated to [a] legitimate state goal. . ." *Doe v. Beaumont Independent School Dist.*, 8 F.Supp.2d 596, 606 (E.D. Tex. 1998) (citing *Doe v. Taylor ISD*, 15 F.3d 443, 451-52 (5th Cir. 1994). The Defendants actions are the height of arbitrariness and unreasonableness.

Nesbit has adequately pled causes of action against the Defendants for violation of his due process rights under the Fourteenth Amendment.

## Argument III

### PLAINTIFF ADEQUATELY PLEADS THAT HIS STUDENTS' FIRST AMENDMENT RIGHTS OF FREE SPEECH AND ASSOCIATION WERE VIOLATED AND PLAINTIFF WAS HARMED AS A RESULT

". . . First Amendment rights of speech and association extend also to high school students." *Bender v. Williamsport Area School District*, 475 U.S. 534, 556 (1976) (Powell, J.,

16

dissenting) (citing *Board of Education v. Pico*, 457 U.S. 853 (1982) (opinion of Brennan, J.); *Tinker v. Des Moines School District*, 393 U.S. 503, 506-507 (1969). While the Constitution recognizes discretion of states and local school boards in matters of education, "we have necessarily recognized that the discretion of the states and local boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." *Board of Education v. Pico*, 457 U.S. 853, 865 (1982).

"Boards of Education . . . have, of course, important, delicate and highly discretionary functions, but none that they may not perform within the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes" *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 637 (1943).

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), held that a local school board had infringed the free rights of high school students by suspending them from school for wearing black armbands in a class as protest against the Government's policy in Vietnam. The Court held that the school district's authority and discretion could only be used in a manner "consistent with fundamental constitutional safeguards." *Tinker*, 393 U.S. at 507. The Court stated that students did not "shed their constitutional rights to freedom of speech or expression at the school house gate. . .," and that, therefore, although local school boards had "important, delicate, and highly discretionary functions . . .," those functions must be exercised within the limits and constraints of the First Amendment. *Id.* at 506.

17

In the case at bar, students at the school publicly protested the forced resignation of Nesbit, picketing outside the school in a manner that had such public interest that it was covered by the local television station.

The Superintendent retaliated against the protesting students for their admittedly constitutionally protected protests, and retaliated against Nesbit, as well. One of the false reasons given for his original termination, and which was later used to prevent Nesbit from obtaining another job, was that Nesbit had incited a student riot.

Students have a constitutional associational right under the First and Fourteenth Amendments to associate with, and have as role models, teachers of a particular race. *See, e.g., Castaneda v. Pickard*, 684 F.2d 989, 999-1001 (5th Cir. 1981). There is no such claim, however, unless Defendant's actions were motivated by purposefully racial considerations. *Id*; *Price v. Denison Indep. School District*, 694 F.2d 334 (5th Cir. 1982). In this case, Nesbit has alleged just such "purposefully racial considerations. . ."; *Castaneda,* 648 F.2d at 1001. Nesbit has alleged that he, and the other white teachers, were treated differently and harassed, and that, consequently, none of the white teachers came back for another school year.

As Nesbit "directly suffered 'injury and fact' and he certainly is in a position to assert the rights of his students, just as effectively as they would themselves, he may challenge the school officials' actions as applied to his students." *Nicholson v. Board of Education, Torrance Unified School District*, 682 F.2d 858, 862-63 (9th Cir. 1982) (High school journalism teacher had standing to assert First Amendment rights of his students).

To determine Nesbit's standing to advance the constitutional rights of others, two

questions are asked: "First has the litigant suffered some injury, in fact, adequate to satisfy article III's case - or - controversy requirements; and second, do prudential considerations which we have identified in our prior cases point to permitting the litigant to advance the claim?" *Caplin & Drysdale, Chartered v. U.S.*, 491 U.S. 617, 623 n. 3 (1989).

The "prudential considerations" revolve around three factors: (1) the relationship of the litigant to the person whose rights are being asserted; (2) the ability of the person to advance his own rights; and (3) the impact of the litigation on third-party interest. *Id.* (Citing *Craig v. Boren*, 429 U.S. 190, 196 (1976); *Singleton v. Wulff*, 428 U.S. 106, 113-118 (1976); *Eisenstadt v. Baird*, 405 U.S. 438, 443-446 (1972).

While only the Ninth Circuit has specifically recognized the standing of a teacher to advance the constitutional rights of his students, *Nicholson*, 682 F.2d 862-64 n. 2, several courts have found that plaintiffs have met these "prudential considerations," where the relationship between the third party and the person whose rights are being advanced "is one of special consequence." *See, Caplin*, 491 U.S. at 624. *See, also, Griswold v. Connecticut*, 381 U.S. 479 (1965) (physician entitled to assert privacy rights of married persons they advised on contraception issues); *Okpalobi v. Foster*, 190 F.3d 337, 351-52 (5th Cir. 1999) (abortion providers had standing to challenge Louisiana anti-abortion statute on the basis of their patients' Fourteenth Amendment rights). The student-teacher relationship is obviously one of "special consequence," in the same sense as a physician's relationship to a patient.

The second "prudential consideration" - the impact of the litigation on Nesbit's interest - is apparent. The student's activities were closely associated with Plaintiff's losing his job. As to

the ability of the students to advance their own rights, these students are largely impoverished minorities unable to advance their own interests. *See, Caplin*, 491 U.S.at 624.

Certainly, the teacher-student relationship is closer than that of a corporate distributor of contraceptives to its potential customers, as in the case of *Carey v. Population Services, International*, 431 U.S. 678 (1977) in which the court allowed the corporation to challenge state law on behalf of such potential customers; *see, also, Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (owners of a private school were entitled to assert the rights of potential pupils and their parents).

## **Argument IV**

### **PLAINTIFF HAS ADEQUATELY PLED CAUSES OF ACTION FOR MALICIOUS INTERFERENCE WITH EMPLOYMENT AND MALICIOUS INTERFERENCE WITH PROSPECTIVE EMPLOYMENT UNDER STATE LAW AGAINST INDIVIDUAL DEFENDANTS, PHILLIPS AND KEMP**

Nesbit's Second Amended Complaint makes the claim of malicious interference with employment and malicious interference with prospective employment against individual Defendants, Phillips and Kemp.

Mississippi appellate courts have repeatedly held that Mississippi recognizes these causes of action. See *Levens v. Campbell*, 733 So.2d 753 (Miss. 1999); *Collins v. Collins*, 625 So.2d 786, 790 (Miss. 1993); *Shaw v. Burchfield*, 481 So.2d 247, 254-55 (Miss. 1985); *Morrison v. Mississippi Enterprise for Technology, Inc.*, 798 So.2d 567, 574-75 (Miss. App. 2001); *Hollywood Cemetery Ass'n. v. Board of Mayor and Selectmen of City of McComb*, 760 So.2d 715, 719 (Miss. 2000). The Mississippi Supreme Court has also held that this cause of action may be maintained even if the employee is at-will. See *Levins*, 733 So.2d at 760. Further,

"[t]ortious interference with a contract" is defined as a malicious or intentional interference with a valid and enforceable contract by a third party which causes one contracting party not to be able to perform and the failure to perform results in a monetary loss for the other contracting party.

*Courtney v. Glenn,* 782 So.2d 162, 164-65 (Miss. App. 2000) (citing *Cenac v. Murry*, 609 So.2d 1257, 1268 (Miss. 1992).

While it is true that a person in the position of authority on behalf of another is privileged to interfere with the contract between the principal and another, "to maintain the privilege, he must be acting within the scope of that authority and without bad faith." *Courtney*, 782 So.2d at 165 (citing *Shaw v. Burchfield*, 481 So.2d 247, 255 (Miss. 1985). Further, privileged interference must be undertaken by someone in the exercise of a legitimate interest or right. *King's Daughters and Sons Circle Number Two of Greenville, Miss. v. Delta Regional Medical Center*, 856 So.2d 600, 604 (Miss. App. 2003). "Under Mississippi law, an agent for a disclosed principal can be held personally liable for his own tortious acts committed within the scope of his employment, and a tort claim can be maintained against that agent. *Hart v. Bayer Corp.*, 199 F.3d 239, 247 (5th Cir. 2000). The agent is subject to personal liability when he 'directly participates in or authorizes the commission of a tort.' *Hart*, 199 F.3d at 247 (quoting *Mississippi Printing Co., Inc. v. Maris, West & Baker, Inc.*, 492 So.2d 977, 978 (Miss. 1986)." *Collums ex rel. v. Union Planters Bank*, 2000 WL 877003, *2 (N.D. Miss. 2000).

The Court in *Morrison v. State Enter. for Tech., Inc.*, 798 So. 2d 567, 574 (Miss. Ct. App. 2001) noted that "one occupying a position of responsibility on behalf of another is **privileged, within the scope of that responsibility and absent bad faith**, to interfere with his principal's contractual relationship with a third person") (emphasis added). The Court in *Morrison* stated that:

21

> We find that the "privilege" is merely a specific example of having "right or justifiable cause" to interfere with the relationship. Tortious interference is based on intermeddling - a tort occurs if without sufficient reason, one person intentionally interferes with another's contract even if the interference is by giving information that is completely accurate, when the purpose was to cause interference and injury results.

*Morrison*, 798 So. 2d at 575. Thus, the *Morrison* Court held that when a defendant acts intentionally to cause injury to the business of another without right of good cause, the element of malice is satisfied. *Id.*

Recently, the United States Court of Appeals for the Fifth Circuit has ruled that a mayor could be individually liable for malicious interference with a police chief's employment, when the mayor caused the chief to be fired, not because of reasons of job performance, but because he had investigated the mayor's son. *Gibson v. Estes*, 2009 WL 2245145 (5th Cir. 2009).

The individual Defendants are not protected by the Mississippi Tort Claims Act, as the claim asserts "malicious" conduct, which is specifically excluded from the immunity provision by Miss. Code Ann. § 11-46-7(2). *J.A.M. Promotions, Inc. v. Tunica County Arena and Exposition Center, Inc.*, 2010 WL 1418856 *1 (N.D. Miss. 2010); *Perkins v. Wal-Mart Stores, Inc.*, 2010 WL 610627 *5 (Miss. App. 2010).

## Argument V

## DEFENDANTS' ACTIONS VIOLATED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IN PLAINTIFF'S CONTRACT

"Every contract contains an implied covenant of good faith and fair dealing in performance and enforcement." *Univeristy of Southern Mississippi v. Williams*, 891 So.2d 160, 170-71 (Miss. 2004); *Cenac v. Murry*, 609 So.2d 1257, 1272 (Miss. 1992).

22

While it is settled law that the implied covenant of good faith and fair dealing does not apply in the context of employment-at-will, *see, e.g., Young v. North Mississippi Medical Center*, 783 So. 2d 661, 663-64 (Miss. 2001); *Harris v. Mississippi Valley State University*, 873 So.2d 970, 986 (Miss. 2004), Nesbit was not an employee -at-will for the duration of his contract. He held the right to good faith performance of the contract during its term.

When the District tried to demote Plaintiff during the term of his contract, he sought a hearing to rebut these charges. It was only after the District learned that witnesses it intended to call would not support the District, but, rather, would speak positively of Nesbit, that the District "rescinded" the termination and shuffled Nesbit off to the alternative school where he was to tutor 5 sixth and seventh graders for remedial reading until the end of his contract.

In *Cenac v. Murry*, *supra*, the court found a violation of the implied duty of good faith and fair dealing where the defendant engaged in "abusive, aberrant, intimidating and harassing behavior" which was designed to force the plaintiffs to forfeit the benefits of the contract. *Cenac*, 609 So.2d at 1272-73. That is exactly what happened in this case.

"Good faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party. The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness." *Id.* at 1272 (citing *Restatement (Second) of Contracts*, § 205, 100 (1979)). The Defendants' conduct in this case surely "violates standards of decency, fairness or reasonableness."

Therefore, Leroy Nesbit has adequately pled a cause of action for violation of the implied duty of good faith and fair dealing inherent in his employment contract.

23

## **Argument VI**

## **FOR PURPOSES OF 42 U.S.C. § 1983, PLAINTIFF HAS ADEQUATELY PLED A POLICY OR CUSTOM OF THE SCHOOL DISTRICT IN HIS SECOND AMENDED COMPLAINT**

Defendant argues that Plaintiff's claims under 42 U.S.C. § 1983 against the School Board require pleading of a "decision . . . policy. . . or custom of the (school district's) policymakers," *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and Plaintiff has not pled such a policy. However, Plaintiff's Complaint alleges the District policymaker (the School Board) failed to control its subordinates.

> Thus, when a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiff's ability to attribute the subordinate's conduct to the actions or omissions of higher ranking officials with policy making authority. One means of doing so, of course, is to establish that a policy maker ordered or ratified the subordinate's actions. *See, Webber v. Bell*, 804 F.2d 796, 803 (2d Cir. 1986) (holding that liability could be premised on sheriff's ordering of unconstitutional strip searches). Another method of implicating a policy making official through subordinate's conduct is to show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions. *See, e.g., Sorlucco v. New York City Police Department*, 971 F.2d 864, 870-71 (2d Cir. 1992) (stating that municipal liability lies where the subordinate's misconduct is 'so manifest as to imply constructive acquiescence of senior policy-making officials'). Thus, where a policy-making official exhibits deliberate indifference to constitutional deprivations caused by subordinates, since that the officials inaction constitutes a 'deliberate choice' then acquiescence may "be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton*, 489 U.S. at 388, 109 S.Ct. 1197 (citations omitted); *see also, Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995); *Jeffes v. Barnes*, 208 F.3d 49, 63 (2d Cir. 2000) (holding that sheriff's acquiescence and unconstitutional retaliation to be inferred from his tolerance and encouragement of harassment of plaintiffs). Moreover, because a single action on a policy-maker's part is sufficient to create a municipal policy, a single instance of deliberate indifference to subordinate's actions can provide a basis for municipal liability.

*Amnesty America v. Town of West Hartford*, 361 F.3d, 113, 126-27 (2d Cir. 2004). *See also, Board of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 409 (1997) ("[E]vidence of a single violation of federal rights . . . can trigger municipal liability."); *Martinez v. City of Opa-Loca*, 971 F.2d 708, 713 (11th Cir. 1992).

A § 1983 plaintiff may establish the liability of a governmental entity by proving "the authorized policymakers approve[d] a subordinates decision and the basis for it." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

Under the Board's policies and with the Superintendent's support, Manika Kemp acted as a "cat's-paw" for the District. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 762 (1988). "If the employee can demonstrate that others had influence or leverage over the official decision makers, and thus were not ordinary co-workers, it is proper to impute their discriminatory attitudes to the formal decision maker." *Russell v. McKinney Hospital Venture*, 235 F.3d 219, 226 (5th Cir. 2000). To invoke the "cat's-paw" analysis, Nesbit must demonstrate: (1) That someone exhibited discriminatory animus; and (2) That this person possessed leverage or exerted influence over the titular decision maker. *Roberson v. Alltell Information Services*, 373 F.3d 647, 653 (5th Cir. 2004). Whether the decision maker rubber-stamps the actions of someone with a retaliatory animus, that animus is imputed to the decision maker. *Ratliff v. City of Gainesville, Texas*, 256 F.3d 355, 363 (5th Cir. 2001). Where the titular decision maker does not conduct an independent investigation, as is exactly the case here, but, instead, relies upon the recommendations of someone with a retaliatory motive, the causal link remains intact. *Long v. Eastfield College*, F.3d 300, 307 (5th Cir. 1996). *See, also, Haas v. ADVO Systems, Inc.*, 168 F.3d 732 (5th Cir. 1999). If

there is an indication that the final decision maker simply endorsed the decision of the person with the improper motive, the causal link remains intact. *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002).

In this case, Plaintiff pleads that Principal Manika Kemp exercised discriminatory and unconstitutional motives and exercised those motives in the harassment of Leroy Nesbit and other white teachers. Nesbit was fired, then transferred, then non-renewed, and the other white teachers at the high school left at the end of the year rather than waiting for their turn.

Nesbit then adequately pleads that complaints about Kemp's racism were made to Superintendent Henry Phillips, who replied that he supported Kemp "100%," and responded by suggesting that Nesbit resign. Phillips relied upon Kemp's judgment, and the Board of Trustees of the School District allowed Superintendent Phillips to run the District as he saw fit, at least in personnel matters.

Drawing all reasonable inferences in favor of Nesbit, Plaintiff has adequately pled enough facts to show liability of the School District under 42 U.S.C. § 1983.

## V. CONCLUSION

Therefore, for the above-stated reasons, Plaintiff prays this Motion, which is filed in bad faith and for purposes of delay, be denied.

26

Respectfully submitted,

WAIDE & ASSOCIATES, P.A.


BY: */s/ Luther C. Fisher, IV* _____
     JIM WAIDE
     MS BAR NO.: 6857
     LUTHER C. FISHER, IV
     MS BAR NO.: 8687


WAIDE & ASSOCIATES, P.A.
ATTORNEYS AT LAW
POST OFFICE BOX 1357
TUPELO, MISSISSIPPI 38802
662-842-7324 (telephone)
662-842-8056 (facsimile)
EMAIL: WAIDE@WAIDELAW.COM

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Luther C. Fisher, IV, attorney for Plaintiff, do hereby certify that I have this day electronically filed the above and foregoing with the Clerk of the Court, utilizing the ECF system, which sent notification of such filing to the following:

Thomas Michael Cronin, Esq.
mike.cronin@arlaw.com
kelly.hatter@arlaw.com

Richard Jarrad Garner, Esq.
jarrad.garner@arlaw.com
Lu.poole@arlaw.com

THIS the 19th day of May, 2010.


     */s/ Luther C. Fisher, IV* _____
     **LUTHER C. FISHER, IV**